Frank IACABONI, Petitioner

v.

UNITED STATES of America, Respondent

Donovan McKenzie, Petitioner

v.

United States of America, Respondent

Mark Pandolfi, Petitioner

v.

United States of America, Respondent

Nos. C.A. 03–30005–MAP, C.A. 03–30013–MAP, C.A. 03–30012–MAP.

United States District Court, D. Massachusetts.

March 20, 2003.

Thomas J. Butters, Butters, Brazilian & Small, L.L.P., Boston, MA, for Frank Iacaboni, Petitioner.

Andrew Levchuk, United States Attorney's Office, Springfield, MA, for United States of America, Respondent.

Miriam Conmrad, Federal Defender's Office, Boston, MA, for Office of the Federal Defender.

Charles W. Rankin, Boston, MA, for National Ass'n of Criminal Defense Lawyers, Criminal Justice Act Bd.

*MEMORANDUM REGARDING DEFENDANTS' MOTIONS TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255* (Docket No. 1)

PONSOR, District Judge.

## I. INTRODUCTION

The three petitioners in these cases were all sentenced to short terms of imprisonment, with recommendations that their sentences be served in a community confinement setting. Based on the Congressional mandate that authorizes it to designate a prisoner to "any available penal or correctional facility that meets minimal standards of health and habitability," 18 U.S.C. § 3621(b), the Bureau of Prisons ("BOP") adopted the court's recommendations regarding two of the three offenders

and confined them in halfway houses, where they are now serving their sentences as model prisoners. No facility has as yet been designated as the place of imprisonment for the third petitioner, who was sentenced more recently.

In making the recommendations for community confinement, the court relied upon the definition of the BOP's scope of discretion as set forth in § 3621(b). It also relied upon explicit instructions, regularly provided to judges in various formats, to the effect that community confinement is a proper sentencing option for offenders serving relatively modest terms of imprisonment. Finally, the court had in mind the fact that recommendations to community confinement have been made in thousands of cases by hundreds of judges continuously since at least 1965, and in nearly all instances accepted by the BOP. In advising the defendants, counsel presumably also relied on the statute, the widely circulated information and the well established practice.

On December 13, 2002, weeks or months after the three sentencings, a lawyer within the Department of Justice carrying the title of "Principal Deputy Assistant Attorney General" composed an eight-page memorandum in which he characterized as "unlawful," under *any* circumstances, the long-established BOP practice of placing inmates in community corrections facilities to serve short terms of imprisonment. *See* Exhibit A, attached. Compelled by this memorandum, the BOP has now taken the position that designations of offenders to community confinement to serve sentences of imprisonment are forbidden as a matter of law and therefore beyond its discretion. As a result, the BOP has informed all federal judges that it will no longer—ever—consider a judge's recommendation that an offender serve a term of imprisonment in community confinement, under any circumstances. *See* Exhibits B and E, attached. Moreover, the BOP has announced, this new sentencing regime will be retroactively applied. Individuals currently at halfway houses with more than 150 days remaining in their sentences, including two of the three petitioners now before the court, are to be transferred within thirty days to more conventional "prison institutions." *See* Exhibits C and D, attached.

In their petitions pursuant to 18 U.S.C. § 2255, the three petitioners contend that, given this radically altered sentencing landscape, they are entitled either to an order maintaining their placements in community corrections facilities, or to re-sentencing.[1] The court will allow the petitions for the following reasons, stated now in summary and set forth in greater detail below.

First, the well-established practice of the BOP—repeatedly and explicitly conveyed to the judiciary—of carefully considering and, where appropriate, adopting judicial recommendations to place offenders in community confinement to serve their terms of imprisonment was not, and

---

1. The Government's opposition to the petitions has not raised any objection regarding the specific named defendant. This memorandum has been drafted on the assumption that, if necessary, the pleading could be amended to name the Attorney General, current Director of the Bureau of Prisons, or other appropriate federal defendant. Similarly, the court assumes that, if necessary to invoke the full remedial powers of this court, the pleading could be amended to state a claim under 18 U.S.C. § 2241. The obvious futility of any administrative remedy would excuse the failure to exhaust. *See, e.g., Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir.1994) (exception to exhaustion requirement for § 2241 claim applies when attempt to exhaust would be patently futile); *Ezratty v. Commonwealth of Puerto Rico,* 648 F.2d 770, 774 (1st Cir. 1981) (exhaustion not required when the issue is a "pure matter of law") (Breyer, J.).

is not, even remotely "unlawful." The amputation of the BOP's discretion attempted by the DOJ's December 13 memorandum disregards the controlling statute, which clearly expresses Congressional intent in this area. Moreover, the BOP's pre-December 2002 understanding of its discretion was recognized implicitly by the Supreme Court and well known to the Sentencing Commission. The suggestion that the old approach was "unlawful" is simply false. Since the BOP's recent forced renunciation of its own lawful discretion flies in the face of the controlling statute, it is invalid.

Second, the BOP's manner of adopting this fundamental change, even assuming it had substantive merit, was improper. As will be seen, the BOP's abrupt action, without prior notice or opportunity for comment, violated the Administrative Procedure Act. As such, the announced change in the BOP's approach to community confinement is without effect.

Third, the retroactive application of this policy to offenders already sentenced, and in two cases already serving their sentences, violates constitutional due process protections afforded persons standing before the court to be sentenced. The Government may not repeatedly and emphatically instruct judges, defendants and counsel that short terms of imprisonment may, in proper circumstances, be served in community confinement, and then, *after* sentencing, change the basic rules.

For these reasons, the court will grant the petitions. In the cases of Iacaboni and McKenzie, the BOP will be enjoined from transferring them from their current community confinement facilities. In the case of Pandolfi, the BOP will be ordered to designate a place of imprisonment by applying pre-December 2002 criteria without consideration of its new and invalid interpretation of its discretion.

A final point must be added. It is no exaggeration to say that the December communications reflected a disregard for—indeed, almost an insult to—the courts. The affront was particularly grave to judges who had imposed sentences in reliance on the then-prevailing sentencing regime. A sentencing option of longstanding acceptance, clearly supported by statute and repeatedly reflected in the practice of hundreds of judges, was abruptly snatched away without opportunity for comment by judges or the Sentencing Commission, and without even prior notice—based upon the transparently specious rationale that the old policy was "unlawful." The lack of respect for the proper role of the judiciary, the plain discourtesy in the brusque manner of notification, and particularly the subversion of the sentencing process by the insistence on a retroactive application of the new sentencing rules, all were highly offensive and gratuitous. Even if the BOP's about-face on community corrections could somehow be justified—and it cannot—it should never have been carried out in the cavalier manner it was.

## II.  *FACTUAL BACKGROUND*

As noted above, this memorandum addresses the claims of three petitioners. Their cases are summarized below.

### A.  *Frank Iacaboni.*

Frank Iacaboni was a bookmaker in Springfield, Massachusetts between 1995 and 1998. He pled guilty on March 26, 2002 to three counts of conspiracy, as well as substantive counts of conducting an illegal gambling business and money laundering. At sentencing on June 19, 2002 there was no dispute regarding the calculation of the Sentencing Guidelines. Iacaboni was in a Criminal History Category I, evidencing his minimal prior criminal record, and

an Offense Level 12, producing a guideline range of 10–16 months. Before sentencing, defense counsel argued vigorously for a downward departure, pointing to Iacaboni's recent impressive work record and particularly his pallet-making business, which at that time employed several people. Despite these arguments, the court did not depart but imposed a sentence of ten months custody of the BOP, with the recommendation that the sentence be served in community confinement, followed by three years of supervised release. The court also imposed a fine of $30,000 and an assessment of $500. Significantly, in addition, the court ordered Iacaboni to forfeit some $384,245, on the ground that these monies constituted the fruit of his illegal conduct. Neither the defendant nor the Government appealed the confinement portion of the sentence.

I imposed this sentence in reliance on what I had been repeatedly informed and instructed regarding my sentencing options. This information told me that the BOP carefully considered judicial recommendations to community confinement and accepted them, if such a placement was proper. I of course knew, and fully accepted, the reality that my recommendation was not binding on the BOP and that the placement would not be made if Iacaboni was not appropriate for community corrections. I did not know, and was never informed, that my sentencing options would shortly decrease, and that judicial recommendations to community confinement were on the threshold of becoming meaningless, never to be followed. I certainly had no idea that Iacaboni might be properly placed in community confinement and, sometime later, might face automatic transfer to a distant, "prison institution."

With proper information—that is, without misinformation—my entire approach to the sentencing proceeding would have been different. Part of the reason I declined defense counsel's invitation to depart downward based on the need for the defendant to preserve his legitimate business, and the jobs of his employees, was my confidence that it was *highly likely* that the BOP would adopt my recommendation for community confinement, which would allow the defendant to live at a halfway house and work during the day. At the June 19, 2002 sentencing proceeding, I indicated my impression that "I could make a recommendation for confinement as you know even now and he could serve his entire sentence in community confinement . . . ." (Tr., June 19, 2002, at 27).

If I had known that, contrary to what I had been told, there was *no possibility* of a halfway house placement, I would certainly have considered departing downwards two levels to an Offense Level 10 (thus moving the sentence from Zone C to Zone B) and imposing precisely the same sentence, but with the assurance that it definitely *would* have been served in community confinement.

As it happened, my expectation regarding the BOP response to my recommendation was at first confirmed when, after routine evaluation, Iacaboni was, in fact, designated to a community corrections facility near his home. For roughly seven months now, he has been imprisoned at a halfway house, and released during the day six days a week to manage his business. As a result, during a period of national and local economic decline, his business has grown to where it now employs twenty-two people. He has been a model prisoner with no disciplinary problems of any kind.

On December 23, 2002, I received notice that, because his placement was supposedly unlawful, the BOP would be transferring Iacaboni to a distant, high-security facility after thirty days. On December 27, 2002, I issued an order requiring coun-

sel to appear for a status conference to discuss the December 23 letter. On January 10, 2003, I established a schedule permitting the Government and defense counsel the opportunity to address the issues raised by the BOP's communication. At the same time, I issued a restraining order barring any transfer of Iacaboni pending further order of the court.

### B. *Donovan McKenzie.*

In May of 2001, Donovan McKenzie participated in a conspiracy to possess with intent to distribute cocaine. An individual named Shirlick Jackson was apprehended on May 4, 2001 at the Charlotte, North Carolina International Airport, on arrival from Jamaica, carrying four roasted yams that had been hollowed out and filled with a little less than one kilo of powdered cocaine each. Jackson agreed to cooperate and thereafter made a controlled delivery of one of the kilos to Donovan McKenzie, a naturalized American citizen originally from Jamaica, who had driven up from New York to Springfield, Massachusetts to meet Jackson. McKenzie was arrested as he attempted to take delivery of one of the yams. The drug operation had been choreographed via telephone from Jamaica by Shirlick Jackson's brother, Bil West Jackson, who was not apprehended. At the time of his arrest, McKenzie had no prior record of any kind.

McKenzie was initially detained but was released by Magistrate Judge Kenneth P. Neiman on May 23, 2001 and allowed to return to his home in Brooklyn, New York under strict conditions. For more than a year following his pre-trial release the defendant lived without incident in Brooklyn, working at a bakery and supporting his girlfriend and three minor children.

On June 28, 2002, McKenzie pleaded guilty to one count of conspiracy to possess with intent to distribute cocaine; pending sentencing, he continued to live in Brooklyn without incident. On September 25, 2002, he appeared for sentencing. With a Criminal History Category of I and an Offense Level 21, McKenzie faced a guideline range of 37–46 months.

By the time of sentencing McKenzie had entered into an agreement to obtain ownership of the bakery he worked at. He, of course, continued to provide for his three children. Daily, he walked the children to and from school in the often dangerous Bedford–Stuyvesant area of Brooklyn where they lived, helped with the children's homework and, along with his girlfriend, provided a stable, loving home. At sentencing, the court departed downward on the well recognized ground that McKenzie's crime constituted aberrant behavior, and imposed a term of imprisonment of one year and a day with a recommendation of community confinement, followed by three years of supervised release with the first year to be served in home confinement. Again, neither the defendant nor the Government appealed the sentence.

After routine evaluation, the BOP again adopted the court's recommendation and designated McKenzie to a community confinement facility in Brooklyn to serve his term of imprisonment. He self surrendered on October 23, 2002 and for almost five months now has been living in a halfway house, working six days a week at his bakery, without incident, supporting his family. Like Iacaboni, he has been a model prisoner.

In imposing this sentence, again, I relied on explicit information given to me to the effect that the BOP would consider carefully and, when appropriate, adopt judicial recommendations to community confinement. Had I known that this information was false, and that McKenzie would face automatic transfer to a distant, high security facility, with the resulting catastrophe

to his children, my sentence almost certainly would have been different. In my downward departure, I would have considered, for example, a sentence of four years probation, with a condition that the first year be served in community confinement and the second year in home confinement. Substantively, this sentence would have been identical to the one I actually imposed. Semantically, since it would have been a sentence of "probation" and not "imprisonment," McKenzie would have been assured of the opportunity to complete his term of confinement near home, working and supporting his children.

On December 23, 2002, the BOP notified me that, because his placement in community confinement was supposedly unlawful, McKenzie would be transferred to a high security facility after thirty days. On January 10, 2003, as with Iacaboni, I issued an order prohibiting transfer of McKenzie out of community confinement pending further order of the court.

### C. *Mark Pandolfi.*

Mark Pandolfi was a an addicted gambler who spent four months in prison for refusing to testify before a federal Grand Jury investigating illegal gambling and loan sharking in Springfield, Massachusetts. After serving this term of civil incarceration, Pandolfi was then indicted for criminal contempt on October 4, 2001. On July 31, 2002, he pled guilty to this one count indictment.

When he appeared for sentencing on December 10, 2002, the court found, based on his minimal criminal record, that he occupied Criminal History Category I. With an offense level of 10, Pandolfi faced a Guidelines range of 6 to 12 months, a Zone B sentence. At the time of sentencing Pandolfi resided with, and contributed to the support of, his wife and stepchild. On a daily basis, he also assisted his parents, who both suffer serious illness. Pan-

dolfi's attorney argued for a downward departure based upon the defendant's mental impairment—the emotional deficits that had led to his gambling addiction—and upon extraordinary post-arrest rehabilitation.

Despite the fact that Pandolfi had already served four months of civil imprisonment for the same conduct, the court declined to depart and imposed a sentence of ten months, with a recommendation of community confinement, followed by one year of supervised release with 100 hours of community service. Less than two weeks after imposition of the sentence, and before a facility had been designated to receive Pandolfi, the BOP abruptly renounced community corrections sentences. Pandolfi, as things stand now, faces the prospect of a ten-month sentence without any possibility that it will be served in community confinement. The court has extended Pandolfi's surrender date pending a ruling on this petition.

As before, if I had known that the information I relied upon at the sentencing was false, and that any possibility that the BOP would follow my recommendation would disappear in less than two weeks, my sentence for Pandolfi would have been different. As with McKenzie, a minimal change in the wording of the sentence would have resulted, as a practical matter, in the same terms, with the assurance that Pandolfi's sentence would be served in community confinement. This change in the wording would have been especially simple given that Pandolfi's sentence was in Zone B. *See* U.S. Sentencing Guidelines Manual § 5C1.1(c) (2002).

### III. *DISCUSSION*

A. *Recommendations for Imprisonment in Community Confinement: Background.*

There can be no doubt that, at the time these defendants were sentenced, the op-

tion of community confinement placement for offenders serving short terms of imprisonment was recognized as well within the BOP's discretion and commonly used. After learning of the BOP's intended change of course, I wrote to Kathleen Hawk Sawyer, then-Director of the Bureau of Prisons and a highly competent correctional administrator, questioning the manner and substance of the BOP's abrupt turnabout. Her response confirmed the BOP's previous "deeply rooted practice of honoring, when appropriate, judicial recommendations that low-risk, non-violent offenders serving short prison sentences be directly designated to [community corrections facilities]." *See* Ex. E attached.

The longstanding integration of community confinement placements into the sentencing process went beyond mere past practice, however. The availability to judges of the option of recommending appropriate defendants to community confinement for short prison terms has been discussed and approved at regular sentencing seminars since the Sentencing Guidelines were first enacted. Judges, in other words, have been actively instructed and encouraged to consider this valid sentencing option. The 2000 Bureau of Prisons' *Judicial Resource Guide to the Federal Bureau of Prisons,* ("*Guide*"), for example, informs judges that because a "Community Corrections Center meets the definition of a 'penal or correctional facility,'" the BOP is "not restricted ... in designating a CCC for an inmate and may place an inmate in a CCC ... if appropriate." *Guide,* at 46.[2]

It cannot be emphasized too strongly that the BOP's December announcement threatened not just the frustration of my well founded subjective expectations, but revealed that I had been *actively and repeatedly misled* about the availability and even (according to the DOJ's December 2002 memo) the "lawfulness" of the community confinement option, for years. The plain words of the statute defining the scope of the BOP's discretion—the BOP now says—should have been disregarded. No judicial responsibility is more serious than sentencing. This difficult work cannot be done with any integrity when the judge is actively misled by false information.

It is worth pausing to note that my reliance on the availability of a community confinement designation derived not just from the statute, and what I had been repeatedly told, but also on the undisputable fact that, in the proper case, such a designation makes eminently good sense. Of course for the defendant the advantages are obvious. Imprisonment in a halfway house usually means the inmate will be residing closer to his or her home community, can continue employment outside the facility during the day, and can maintain ties with vulnerable family members, such as children or ailing parents.

But the advantages of community confinement to defendants constitute only a fraction of their particular usefulness. For innocent third parties, particularly children, the economic and emotional devastation caused by a parent's distant incarceration can be, to some extent, palliated. With the inmate employed, families can stay off welfare; with a parent available, children can avoid placement in foster homes. For the Government wishing to recognize substantial assistance provided

---

2. Although the court has not located a copy, the *amicus* brief of the National Association of Criminal Defense Lawyers and the Criminal Justice Act Board confirms that the same point was made in the Bureau's 1995 publication, *A Judicial Guide to the Federal Bureau of Prisons,* at 10–11. The current *Guide* is available at *http://fpd.home.texas.net/bopjrg.pdf* (last visited March 19, 2003).

by a cooperating defendant this option also holds out advantages during plea negotiations, and at sentencing. Finally, of course, perhaps the Number One beneficiary of community corrections is the American Taxpayer, since the cost of community confinement, when it serves the interests of justice, is far less than the price tag on more conventional forms of imprisonment. When one remembers that persons placed in community corrections are generally minor offenders, with minimal or no criminal records, and no history of violence, the decision to entirely eliminate community corrections as an optional imprisonment designation becomes even more astonishing.[3]

Gossip in the media suggests that the spur for the sudden and impulsive about-face, taken in the teeth of the statute, arose from discomfort at the DOJ that it be perceived as soft on white collar criminals, who, it was feared, were inordinately benefitting from community corrections sentences. *See,* Exhibits F, G and H, attached. To the extent that these rumors are true, the DOJ's perception was incorrect in two respects.

First, the vast majority of defendants sentenced to community corrections have been of the distinctly grimy collared variety: bottom-echelon drug mules, single mothers struggling on welfare, men and women who had, after committing their crimes, demonstrably repudiated their old lives and were working steadily and supporting their children—all with minimal or no criminal records and no history of violence. Some evidence suggests that community confinement inmates have been disproportionately female. *See, Culter v.*

*United States,* 241 F.Supp.2d 19, 23 n. 3 (D.D.C.2003) (noting that 45 out of 132 inmates now facing transfer out of community corrections are female, compared with an overall female inmate population of 6.9%). The possibility that some of these offenders might be diverted from distant and expensive high-security prisons and kept working to support their families was, in many cases, as attractive to the Government as it was to the defense.

The DOJ's perception that community corrections sentences might coddle white collar offenders (again, if the media reports are accurate) also ignored the fact that the courts have always retained the discretion to withhold a recommendation for community corrections where it was inappropriate. Moreover, even where the recommendation was made, the BOP retained the discretion to decline the recommendation and place the offender in a higher level facility where proper.

To jettison even the possibility of a sentence of imprisonment to community corrections—for anyone, ever—is the ultimate act of tossing out the proverbial baby with the bath water. Thanks to this new policy change, even where the judge, the defense and the prosecutor all agree that a sentence to a term of imprisonment in a halfway house would be appropriate, it will now apparently be impossible. This bureaucratic rigidity will injure the very communities, and the society, the laws are designed to protect. More than ever, robotic "policy," and not human intelligence, will drive the system—to everyone's detriment.

---

3. The bitter irony, from a judge's viewpoint, of the BOP's December bombshell was underlined in the Sentencing Commission's December 2002 *Survey of Article III Judges,* which arrived at about the same time. The "Summary Report" of the survey noted, at page 4,

that the "vast majority of responding judges were positive about the availability of alternatives to incarceration and did not want to see this availability reduced." The *Survey* is available at *http://www.ussc.gov/publicat/jsurvey02.pdf* (last visited March 19, 2003).

B. *The "Lawfulness" of Designating Imprisoned Offenders to Community Confinement.*

■ While the December 13, 2002 memorandum (Ex. A) may perhaps be explained as an effort to patch together a rationale for a preordained policy decision, it is not objective legal analysis. It attempts to achieve its purpose by exaggerating enormously the force of ambiguous language in the Sentencing Guidelines and minimizing the will of Congress as expressed with perfect clarity in the controlling statute. In the process, the memorandum shrugs off Supreme Court authority and grossly distorts circuit-level decisional law. No fairminded and reasonably neutral assessment of the foundations of the BOP's practice of designating certain offenders to community corrections could possibly conclude that the old practice was "unlawful." A review of the applicable law and other authority makes this crystal clear.

1. *The Statutory Framework Established by Congress.*

The DOJ's analysis adopts a curious posture, starting with a corner of the Sentencing Guidelines, then working backwards to the controlling general statute. This approach, while it may be a clever rhetorical tactic, begins the wrong way around. A proper analysis of the BOP's practice should begin with the governing statute; statutes trump guidelines, not vice versa. On this point, the Supreme Court could not have been more emphatic:

> Congress has delegated to the Commission "significant discretion in formulating guidelines" for sentencing convicted federal offenders. Broad as that discretion may be, however, it must bow to the specific directives of Congress.

*United States v. LaBonte,* 520 U.S. 751, 757, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) (citation omitted).

In *LaBonte,* Justice Thomas addressed the proper understanding of the phrase "maximum term authorized" in the Career Offender guideline, § 4B1.1. Responding to confusion in decisional law, the Sentencing Commission had amended the commentary to § 4B1.1 to make it clear that the "maximum" intended was the base statutory maximum, without consideration of any enhancements applicable to a particular defendant. The Supreme Court found this commentary inconsistent with the Congressional will reflected in 28 U.S.C. § 994(h) and therefore invalid. "Maximum" meant maximum, *i.e.,* base statutory maximum plus enhancements. Where guidelines commentary is at odds with the "plain language" of a statute, the Court said, then the commentary "must give way." *LaBonte,* 520 U.S. at 757, 117 S.Ct. 1673.

Therefore, the proper place to begin the evaluation of the lawfulness of the BOP practice is with the words of Congress, which define what is "lawful." In 18 U.S.C. § 3551 Congress describes the "authorized sentences" for individuals and organizations. For individuals, only three types of sentences are authorized: a term of probation, a fine and a term of imprisonment. 18 U.S.C. § 3551(b). Significantly, this statute does not attempt to break out community confinement as constituting anything other than "imprisonment." Any sentence that is not probation or a fine constitutes a form of imprisonment.

To determine where a sentence of imprisonment shall be served, the controlling statute, 18 U.S.C. § 3621(b) states:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate *any available penal or correctional facility* that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Gov-

ernment or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable. . . .

*Id.* (emphasis supplied).

Late in the December 13 memorandum, the author offers to "assume *arguendo*" that a community confinement facility may constitute a "penal or correctional facility." Ex. A at 7, n. 8. But it is not necessary to rely on any assumption of this sort. A glance at statutory history immediately reveals an understanding of the phrase fully supporting the BOP's practice and going back continuously for almost forty years. The 1965 amendment to the predecessor statute, former 18 U.S.C. § 4082(b), added the phrase "or facility" after "institution," specifying the kinds of places that could be designated for service of a sentence. This amendment explicitly defined "facility" to include a "residential community treatment center," the old term for "community confinement." *See* 18 U.S.C. § 4082(b) (2003) (recodified in 18 U.S.C. § 3621(b)) (noting that the "term 'facility' shall include a residential community treatment center").[4]

It is well recognized that the enactment of § 3621(b) was "not intended to change pre-existing law with respect to the authority of the Bureau." *McCarthy v. Doe,* 146 F.3d 118, 123 n. 2 (2d Cir.1998), quoting *Barden v. Keohane,* 921 F.2d 476, 481 (3d Cir.1990). Congress itself made this clear:

Proposed 18 U.S.C. § 3621(b) follows existing law . . . . After considering [specified] factors, the Bureau of Prisons may designate the place of imprisonment in an appropriate type of facility.

S. Rep. 98–225, at 141–42 (1983), 1984 U.S.C.C.A.N. 3182, 3324.

In short, what the BOP could do from 1965 to 1987—in terms of designation—under the old statute, it can now do under the new law. Nothing has changed. Community confinement constitutes one form of "imprisonment," and a community confinement facility is a "penal or correctional facility."

Even without this history, the plain language of § 3621 obviously covers a community confinement facility, and no whisper of anything to the contrary can be found anywhere, in anything Congress has said. Congress intended by this language to authorize the BOP, when it receives an offender to serve a term of imprisonment, to consider a community confinement designation if appropriate—period.

Moreover, Congress gave the BOP guidance as to the specific factors to be considered to make the determination regarding the appropriate "available penal or correctional facility" for a particular offender. It was to consider five factors: (1) the resources of the facility; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court concerning the purposes of the sentence or recommending a type of *penal or correctional facility* as appropriate, and (5) any pertinent policy statement issued by the Sentencing Commission. 18 U.S.C. § 3621(b).

Thus, Congress not only instructed the BOP to consider a community corrections facility among possible placements for sentenced offenders facing imprisonment, but also instructed the BOP to consider *judicial* recommendations to these facilities.

---

4. A description of the transition from § 4082 to § 3621 is set forth in *Barden v. Keohane,*

921 F.2d 476, 481 (3d Cir.1990).

In response to this compelling language, the DOJ's December 2002 memorandum employs the rather dog-eared trick of the "artful negative," stating: "Nothing in section 3621(b) provides BOP clear authority to place in community confinement an offender who has been sentenced to a term of imprisonment." Ex. A, at 6. The only way this utterly unsupportable statement can be read to make any sense is to assume, perhaps, that the author meant that the cited statute, in its current form, does not explicitly give the BOP "clear authority," *in haec verba.*

But this statement (and fudge phrases of this sort are employed repeatedly throughout the memo) ignores the *positive* authorization given the BOP to consider *any* appropriate facility, as well as the complete absence of any hint of a prohibition against considering community corrections facilities as part of that authorization.[5] Given this broad statutory language, the BOP had all the authority it needed to consider community corrections facilities for offenders sentenced to imprisonment. The DOJ's sideways suggestion that there is no "clear authority" to do this is flat chicanery.

The consistent practice of the BOP, and the statements of the Sentencing Commission and the DOJ itself also expose the speciousness of this lack of "clear authority" argument.

2. *The Bureau of Prisons, the Sentencing Commission and the Department of Justice.*

The practice of placing appropriate defendants into community confinement to serve short sentences of imprisonment was consistently recognized from the 1965 amendment noted above, through the passage of the Sentencing Reform Act in 1984 and its effective date in 1987, and continuously thereafter—not only by judges and attorneys, but by the BOP, the Sentencing Commission and the DOJ itself.

For example, in 1989 a BOP program memo stated: "[O]ccasionally offenders have been committed directly to such [community confinement] facilities to serve short sentences when courts recommend it.... The number of such commitments may increase under the Sentencing Reform Act...." "Program Components in a Contract Community Treatment Center (CTC)" ¶ 2, at 1 (July 1, 1989), *cited in* BOP Op. Mem. 74–88; *see also* BOP Prog. Smt. 5100.07 ("Security Designation and Custody Classification Manual") ch. 4, at 2 (9/3/1999 with 1/31/02 changes)(stating "[d]irect commitment to CCC's may be made on the court's recommendation"). The Manual is available at *http://www.bop.gov,* listed under "FOIA/Policy" (last visited March 19, 2003).

This policy has been expressed regularly in information directly provided to federal judges. As noted above, the year 2000 BOP publication *Judicial Resource Guide to the Federal Bureau of Prisons* explicitly approves the practice. *See Guide,* at 16 (describing "Direct Designation to a Community Corrections Center").

The Sentencing Commission, in its various iterations, was also aware of the BOP's use of community corrections. In its joint report to Congress, as required by 28 U.S.C. § 994(q), entitled "Maximum Utilization of Prison Resources" (June 30, 1994), the Commission and the BOP considered the statutory mandate that classification systems place inmates "in the least restrictive facility necessary to ensure

---

5. It is noteworthy also that the DOJ memo attempts an ungainly leap from the supposed absence of any "clear" authority to the conclusion that the BOP practice was "unlawful." This odd insistence that the BOP's authority must be "clear" to be "lawful" avoids the obvious fact that its authority was manifestly within the Congressional mandate.

their security." 28 U.S.C. § 994(q)(2). The report lauded community corrections centers, explicitly noting both their pre-release component and their community correction component. *See* Bureau of Prisons, *Report to Congress on the Maximum Utilization of Prison Resources,* 9–10 (1994). Given its obvious awareness of the BOP approach to community corrections, the Sentencing Commission could easily have condemned the practice—if indeed it was unlawful—in a Policy Statement pursuant to 18 U.S.C. § 3621(b)(5). In fact, the Sentencing Commission has never so much as hinted that the BOP's well established practice was "unlawful."

Indeed, ten years ago, the Attorney General's Office of Legal Counsel—the same entity that produced the December 2002 memo—concluded:

> There is, moreover, no statutory basis in section 3621(b) for distinguishing between residential community facilities and secure facilities. Because the plain language of section 3621(b) allows BOP to designate "any available penal or correctional facility," we are unwilling to find a limitation on that designation authority based on legislative history.

Memorandum from Attorney General's Office of Legal Counsel, to Director, Federal Bureau of Prisons *4 (Mar. 25, 1992).[6]

3. *The Supreme Court.*

The Supreme Court itself only eight years ago characterized detention within a community treatment center subject to the control of the BOP as a form of punitive confinement that could be credited against a term of imprisonment. In *Reno v. Koray,* 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995), the Court addressed the question of whether a criminal defendant, released following a plea of guilty, but subject to the supervision of Pretrial Services and upon condition that he remain confined in a community treatment facility, would be entitled to credit against his ultimate sentence for the time he spent in the community facility under 18 U.S.C. § 3585(b). Chief Justice Rehnquist, in an opinion joined by seven other members of the court, concluded that because the defendant was "released" and not subject to any control by the BOP, he was not entitled to any credit towards his prison sentence. At the same time, the Chief Justice made it very clear that, had the defendant been in *detention,* and subject to the control of the BOP, even assuming he was confined in the *same* community-based facility, he would have been entitled to credit for that period of detention against his ultimate prison sentence. The key issue, the Court noted, was whether the defendant was subject to the *control* of ·the BOP.

> It is quite true that under the Government's theory a defendant "released" to a community treatment center could be subject to restraints which do not materially differ from those imposed on a "detained" defendant committed to the custody of the Attorney General, and thence assigned to a treatment center. But this fact does not undercut the remaining distinction that exists between *all* defendants committed to the custody of the Attorney General on the one hand, and *all* defendants "released" on bail on the other. Unlike defendants released on bail, defendants who are "detained" or "sentenced" *always remain subject to the control of the Bureau.*

*Id.* at 62–63, 115 S.Ct. 2021 (emphasis in original).

6. This memorandum is available at *http://www.usdoj.gov/olc/quinlan.15.htm,* (last visited March 19, 2003).

The only rational inference that can be drawn from *Koray* is that an offender detained in community confinement and subject to the control of the BOP (in contrast to an offender "released" to the same facility and not subject to BOP control) would, in effect, be serving a term of imprisonment and therefore entitled to an appropriate credit against his ultimate sentence. In other words, the Supreme Court itself recognized (as 18 U.S.C. § 3551 makes clear) that detention at a community confinement facility under BOP *control* equals imprisonment. While *Koray* does not explicitly address the scope of BOP discretion, its holding evinces clear acceptance by the Court of BOP's discretion to *detain* offenders in community confinement as a form of imprisonment.

In sum, favoring the "lawfulness" of the BOP's pre-December 2002 practice there is: (1) the broad wording of the current applicable statute; (2) the explicit wording of the predecessor statute; (3) legislative history and case law indicating the goal of continuity between the two statutes; (4) almost fifty years of consistently articulated BOP policy; (5) the full knowledge, and absence of any objection, on the part of the Sentencing Commission over several generations; (6) the analysis of the DOJ's Office of Legal Counsel itself only ten years ago and (7) the implicit imprimatur of the Supreme Court as recently as 1995.

### 4. *The Post–December 2002 DOJ Position.*

What does the DOJ's December 2002 memorandum offer on the other side?

Four arguments, perhaps, can be distilled from the memo. First, confinement in a community corrections facility just cannot be viewed as a form of "imprisonment." It just cannot. Second, a recently enacted statute recognizes home confinement as appropriate for the *end* of a sentence; therefore Congress must have intended that community confinement would not be employed at any other point in a sentence, or in any other way. Third, courts of appeals have "uniformly determined that community confinement does not constitute 'imprisonment.'" Ex. A at 3. Fourth, one section of the Sentencing Guidelines, § 5C1.1, distinguishes between "imprisonment" and "community confinement." Viewed properly, some of these arguments actually confirm the lawfulness of the BOP's pre-December 2002 practice. None supports the Government's position.

### a) *Community Confinement Constitutes a Form of Imprisonment.*

On this first point, the DOJ memo appears to make the concession (halfhearted and later withdrawn) that the BOP enjoys discretion to determine the *place* of imprisonment. The memo then notes, correctly, that the BOP cannot decide *"whether* the offender will be imprisoned." Ex. A, at 6. The argument then takes the next step— the necessary step if the DOJ argument is to have any hope of making sense—right out onto thin air: confinement in a community corrections facility under the control of the BOP, despite 18 U.S.C. § 3551, despite 18 U.S.C. § 3621(b), and despite *Koray,* is not "imprisonment." Therefore, the argument runs, when the BOP places an offender in community confinement, it is not just exercising its discretion to determine *where* an offender should serve his or her sentence, but is, in effect, actually failing in its duty to "imprison" that inmate.

In support of this dubious logic, the memo offers exactly two facts: (1) offenders are usually not physically confined within a community corrections facility during the day but are allowed to leave to pursue employment, training and education, and (2) offenders (according to a BOP policy statement) "normally become eligible" for weekend passes after the first two weeks in confinement.

The memorandum's flawed argument discloses a surprisingly naive understanding of what constitutes "imprisonment." In a modern penal system, it is the rare prisoner who is immured behind six-foot-thick walls 365 days a years like some character out of a Dumas romance. The statutes themselves make this clear. For example, 18 U.S.C. § 3622(b) allows an inmate, while imprisoned, to "participate in a training or educational program *in the community*." *Id.* (emphasis supplied). 18 U.S.C. § 3622(c) permits an inmate to "work at paid employment *in the community* while continuing in official detention at the penal or correctional facility." *Id.* (emphasis supplied). These statutes recognize that there is absolutely nothing inconsistent with the concept of "imprisonment" in permitting an offender outside physical confinement, into the community, for various reasons during part or all of the day.

Indeed, the notion of "imprisonment" clearly encompasses conditions of confinement substantially *less* restrictive than community confinement. For example, 18 U.S.C. § 3624(c) authorizes the BOP to "assure that a prisoner serving a *term of imprisonment*" is given the opportunity to serve as much as six months of the final portion "*of the term*" in home confinement. *Id.* (emphasis supplied). In other words, Congress has recognized that an offender may serve a portion of a "term of imprisonment" while living at home, *full time.*

Certainly, there is a substantial difference between the conditions facing an inmate in, say, a maximum security prison and one in a halfway house. The same may be said about the relative situations of an inmate placed in administrative segregation, an inmate at a prison camp, an inmate at a metropolitan detention center, an inmate at a "boot camp" program, or an imprisoned patient at a medical center. But the existence of these differences, however great they may be, does not diminish the character of the confinement to the extent that it is no longer "imprisonment."

As the Supreme Court recognized in *Koray,* the critical litmus is whether offenders "*always remain subject to the control of the Bureau.*" *Reno v. Koray,* 515 U.S. 50, 63, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995). Offenders imprisoned in community confinement are subject to BOP control. They are, as Chief Justice Rehnquist noted, "subject to BOP's disciplinary procedures; they are subject to summary reassignment to any other penal or correctional facility within the system, and, being in the legal custody of BOP, the Bureau has full discretion to control many conditions of their confinement." *Id.* (citation omitted). BOP control is the touchstone of "imprisonment," and the BOP exercises complete control over all offenders placed in community corrections. They are imprisoned.

Finally, the argument that the BOP, in exercising its Congressionally-bestowed discretion to designate as the "place of the prisoner's imprisonment ... any available penal or correctional facility," 18 U.S.C. § 3621(b), is, in effect, *failing* to "imprison" the offender when it designates him or her to a community corrections facility simply ignores 18 U.S.C. § 3551, which can only be read to include community confinement as a form of imprisonment, the last category of the three "authorized sentences." Thus, as a matter of law, and a matter of common sense, the argument that community confinement is not a form of imprisonment will not wash.

b) *18 U.S.C. § 3624(c) Has No Relevance to Community Corrections.*

The DOJ memo contends that the authorization contained in § 3624 to transfer an

offender to *home* confinement for up to six months of the final portion of his sentence would be rendered "null" if the BOP possessed the power, in any other circumstance, to place an offender in *community* confinement to serve a short sentence of imprisonment. Ex. A, at 7. Again, this argument is so wobbly it collapses as soon as it is formed into words.

Section 3624(c) does not so much as mention community confinement. The phrase never appears; the most reasonable interpretation of § 3624(c) is that it simply has no relevance whatsoever to community corrections facilities. Even if some reference to community confinement might somehow be inferred—and it is difficult to see how it could be—nothing suggests that Congress intended § 3624 to be the exclusive mechanism permitting placement of an offender into such a facility.

The fact is, as noted above, § 3624 obviously *supports* the power of the BOP to place offenders in community confinement to serve their terms of imprisonment. If a sentence of imprisonment can be served at home, it can be served in a halfway house.

### c) *Decisional Law Is Not Uniform*

The December 2002 memorandum offers the following statement:

> Consistent with the plain meaning of section 5C1.1 the federal courts of appeals have uniformly determined that community confinement does not constitute "imprisonment" for purposes of satisfying either the requirement under that section that "at least one-half of the minimum term [of a Zone C split sentence] be satisfied by imprisonment" or the requirement that a Zone C or Zone D simple sentence be a "sentence of imprisonment."

Ex. A, at 3.

As will be seen, decisional authority is not nearly as uniform as the memo's selective quotations would suggest. Before examining the six cases cited by the DOJ in support of this proposition, however, it is worth noting that, even if the quoted statement were true, it would not support the memo's ultimate conclusion (and the BOP's current stance), which is that *no* term of imprisonment may ever be served in community confinement. Sentences of imprisonment under § 5C1.1 reflecting a downward departure, for example, may still be served in community confinement. Beyond this, a review of the cases cited by the Government reveals a patchwork of decisional authority that is far from consistent.

The memo's first case is *United States v. Adler*, 52 F.3d 20 (2d Cir.1995), a *per curiam* opinion. There, the Government appealed a split sentence under the predecessor to § 5C1.1(d)(2), by which the trial judge sentenced a Zone C tax evader facing a 10–16 month guideline range to six months imprisonment in community confinement and six months of supervised release. In the circumstances of that case, the panel did opine, as the Government asserts, that there was a distinction between "imprisonment" ("the condition of being removed from the community") and "community confinement" ("the condition of being controlled and restricted within the community"). *Id.* at 21. Thus, the court found, the sentence to community confinement, in the absence of a downward departure, could not satisfy the "imprisonment" portion of a split sentence. Having made this finding, the court then immediately went on to note that the trial judge had indicated that, if necessary, he would consider his sentence a downward departure. Given that good grounds for departure existed, the trial judge's sentence was affirmed. While from one perspective the language of this short opinion does give modest support to the Government here, it also fundamentally undermines the BOP's basic position that designations to commu-

nity confinement are beyond its discretion, in all circumstances, as a matter of law. *Adler* explicitly recognizes that, at least in cases of downward departure, a sentence of imprisonment *may* be served in community confinement.

*United States v. Swigert,* 18 F.3d 443 (7th Cir.1994), the Government's second case, did not directly involve § 5C1.1. The sentencing in that case was controlled by a plea agreement pursuant to Fed.R.Crim.P. 11(e)(1)(C), calling for a term of eight months "imprisonment." The question before the court of appeals was whether the sentencing judge's construction of the *plea agreement* as requiring a minimum of eight months' full-time confinement in a federal penitentiary constituted "clear error." The Seventh Circuit noted, among other things, that § 5C1.1 distinguished between community confinement and "imprisonment" in concluding that the eight-month sentence was not clearly erroneous. The court also relied on the "plain meaning" of the term "imprisonment" and the defendant's failure to raise his unconvincing construction of the plea agreement until the last minute. *Swigert,* therefore, deals primarily with the construction of a plea agreement; its broader significance is ambiguous.

In support of its "uniformity" argument, the Government (behind the advisory *"see also"*) also offers up *United States v. Voda,* 994 F.2d 149 (5th Cir.1993), in which the sentencing court, as a condition of *probation,* required the defendant to serve sixty days at a local jail. The court of appeals vacated the sentence, finding that the applicable statute, in the context of a sentence of probation, permitted confinement only at a community confinement facility, and that a jail did not fall within that category. *Voda* has no bearing on § 5C1.1 whatsoever, let alone on the BOP's general power to designate an offender to community confinement.

Under this *"see also"* flag, the memorandum cites, in addition, *United States v. Latimer,* 991 F.2d 1509 (9th Cir.1993). As with *Voda,* Latimer does not address § 5C1.1, or the BOP's general powers, at all. Beyond this, *Latimer* (along with the cases associated with it) discloses the struggle courts have had with the concept of "imprisonment" within the Sentencing Guidelines, as well as the lack of consistency in the DOJ's own position. Boiled down to its essence, *Latimer* concerned the method of calculating a defendant's Career Offender status under § 4B1.1. The question was whether defendant's prior service of a term of community confinement might be viewed as a form of "incarceration" triggering Career Offender treatment as set forth in § 4A1.2(e)(1). In sharp contrast to its stance in this case, the Government in *Latimer* argued that community confinement *should* be treated as equivalent to incarceration. The Ninth Circuit observed:

> Unfortunately, other than equating a "sentence of incarceration" with a "sentence of imprisonment," the Guidelines do not define incarceration. Nor do they address whether detention in a community treatment center qualifies as incarceration.

*Id.* at 1511 (citation omitted).

After discussing various provisions of the Guidelines, the court in *Latimer* decided—tentatively, over a dissent, and in the teeth of the Government's opposition—to "interpret the term incarceration in § 4A1.2(e)(1) to exclude detention in a community treatment center or halfway house." *Id.* at 1514. In the absence of clarity, and in view of the fact that an adverse construction would have added fifteen years to the sentence, the Ninth Circuit concluded that the "rule of lenity compels us to resolve ambiguities in favor of the criminal defendant." *Id.* Again, *La-*

*timer* throws no light upon the BOP's general discretionary power to designate an offender to a community corrections facility.

Despite its claim of uniformity, the Government does acknowledge, in a footnote, that *United States v. Rasco*, 963 F.2d 132 (6th Cir.1992), took a position opposite from *Latimer*. In *Rasco*, the Sixth Circuit held, with Government support, that confinement within a halfway house *did* constitute "incarceration" for purposes of Career Offender status and therefore justified the greatly enhanced sentence. *Id.* at 136. In addressing the apparently inconsistent language of § 5C1.1 *Rasco* noted that the guidelines "caution against attempting to achieve definitional coherence across numerous provisions." *Id.* at 137.

*United States v. Serafini*, 233 F.3d 758 (3d Cir.2000), the fifth case cited in support of the "uniform" position of the courts of appeal, merely underlines the point that the Sentencing Guidelines bind the *courts*, not the BOP. Serafini, a convicted perjurer, received a ten-month split sentence: five months imprisonment with a recommendation to community confinement and five months home confinement. In response to the Government's appeal objecting to the community confinement recommendation, the court agreed, given the language of § 5C1.1(d), that *"imposition of a community confinement sentence would violate the Guidelines." Id.* at 777 (emphasis in original). The court held, however, that the sentencing judge's mere *recommendation* of community confinement was not reviewable, and that the decision by the BOP to place the offender in community confinement, even if contrary to the Sentencing Guidelines, was "beyond our jurisdiction." *Id.* at 778. The sentence therefore stood as imposed. The only rational inference to be drawn from *Serafini* is that a sentencing judge may make a recommendation, and the

BOP, operating independently of the Sentencing Guidelines, may then designate the appropriate facility in accordance with 18 U.S.C. § 3621(b), weighing the judge's recommendation among the other factors it will consider. *Serafini*, in other words, recognizes that the BOP has the power, independent of the guidelines, to designate an offender to community corrections; when it exercises this power, the courts will not intervene.

Finally, the December 2002 memo cites *United States v. Jalili*, 925 F.2d 889 (6th Cir.1991). Again, the decision has no direct applicability. Jalilli received a straight sentence of ten months imprisonment, with what purported to be an order that the sentence be served in a specific community confinement facility. The BOP duly placed the offender in the facility. Shortly afterwards, Jalilli was convicted in state court of new offenses; the conviction persuaded the BOP that he was no longer eligible for community confinement, and the defendant was transferred to a more secure facility. In response to a petition under 28 U.S.C. § 2255, the judge then resentenced Jalilli to probation with six months community confinement as a condition. On appeal by the Government, the Sixth Circuit reversed and reinstated the original sentence, noting that the sentence of ten months imprisonment was valid and that the purported "order" designating community confinement was mere surplusage, since the place of confinement was within the discretion of the BOP. The court did observe in *dicta* that, had the court decided to impose a split sentence, the guidelines would have required the defendant to serve the first half of the sentence in a facility other than community confinement.

It is noteworthy that another Sixth Circuit case, again cited by the DOJ memo only in a footnote, held explicitly that for purposes of calculating mandatory super-

vised release under § 5D1.1(a) " 'community confinement' is included within the definition of 'imprisonment' " *United States v. Strozier,* 940 F.2d 985, 988 (6th Cir.1991). In that case, the sentencing judge rightly concluded, with the Government's support, that a sentence of seven months imprisonment in a penitentiary and seven months home confinement would be aggregated to calculate the more than one year of "imprisonment" required to trigger mandatory supervised release.

This unfortunately lengthy overview of the cases cited by the DOJ in its December 2002 memorandum merely reveals a number of ambiguities in the decisional law in this area, and the difficulty, as the *Rasco* court observed, in achieving "definitional coherence" with regard to the concept of "imprisonment." The only discernible uniformity in these cases is the Government's consistent decision to support the interpretation of "imprisonment" that leads to the harshest sentence. Thus, under the Government's logic, community confinement is the *same* as imprisonment for purposes of the Career Offender statute and the calculation of mandatory supervised release, but *different* from imprisonment for purposes of a split sentence. What also emerges clearly from a close look at these authorities is the number of decisions actually holding, as the DOJ memorandum asserts, that "[c]ommunity confinement does not constitute imprisonment for purposes of a sentencing order, and BOP lacks clear general statutory authority to place in community confinement an offender who has been sentenced to a term of imprisonment." Ex. A, at 1. The number of decisions making that determination is exactly zero.

d) *Section 5C1.1 Does Not Render the BOP's Practice "Unlawful."*

The centerpiece of the DOJ's "unlawfulness" argument is U.S. Sentencing Guidelines Manual § 5C1.1 (2002), which describes "Imposition of a Term of Imprisonment" in the context of the four "zones" of potential criminal sanctions covered by the Sentencing Guidelines. Three important points must be made before turning to the almost impenetrably ambiguous language employed in this guideline.

First, to the extent that § 5C1.1 attempts to render "unlawful" what is lawful under 18 U.S.C. § 3621, then, as the Supreme Court said in *LaBonte,* the guideline must "give way." This unavoidable reality is by no means undercut by the rhetorical gimmickry employed in the December 2002 memo of starting the analysis with the Sentencing Guidelines and turning only at the end to the governing statute.

Second, § 5C1.1 does not control departures. As the Second Circuit's *Adler* opinion demonstrated, nothing in this provision limits the power of the court, in appropriate circumstances, to depart downward and sentence an offender to term of imprisonment to be served in community confinement. In other words, even accepting the Government's strained interpretation of § 5C1.1 (and even, for the moment, accepting the unacceptable notion that this guideline language might somehow trump the Congressional authorization in § 3621), nothing in § 5C1.1 justifies the BOP's apparent blanket prohibition against using community confinement placements for terms of imprisonment in *any* circumstances. A downward departure would permit that very thing, regardless of § 5C1.1.

Third, the Sentencing Guidelines govern what a judge does in imposing a sentence; they do not control what the BOP does *after* the sentence is imposed. As noted above, 18 U.S.C. § 3621(b) directs the BOP, when determining the "appropriate

and suitable" penal or correctional facility for an offender, to consider: (1) the resources of the facility; (2) the nature and circumstances of the offense; (3) the history and characteristics of the offender; (4) any explanatory statement or recommendations by the judge, and (5) "any pertinent *policy statement* issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28." *Id.* (emphasis supplied). Significantly, this statute does *not* direct the BOP to consider the Sentencing Guidelines, which have been enacted to cabin only the *judge's* discretion. Obviously, § 5C1.1 is not a "policy statement;" it is therefore *not* among the factors to be considered by the BOP in determining the appropriate facility for the offender following imposition of the sentence.[7]

Even putting these three considerations aside and examining solely § 5C1.1 itself, it becomes obvious after only a brief review that the language of this provision provides no more than flimsy support for the DOJ's position.

To begin with, it is clear from the language of § 5C1.1 that, most of the time, the term "imprisonment" explicitly *includes* community confinement. In discussing the proper sentence for an offender within Zone A, for example, Application Note 2 to § 5C1.1 contrasts a sentence of imprisonment, on the one hand, with a term of straight probation or a simple fine on the other.[8] In discussing offenders in Zone B, § 5C1.1(c)(2) states that the minimum term may be satisfied by "a sentence of imprisonment that *includes* a term of supervised release with a condition that substitutes community confinement" *Id.* (emphasis supplied). Significantly, this

language does *not* say, as it easily could have, that the minimum term may be satisfied by a sentence of imprisonment, with community confinement *to follow*—or a sentence of imprisonment *plus* community confinement. Rather, imprisonment "includes" community confinement. The same usage is repeated in § 5C1.1(d)(2).

Thus, a fair definition of the term "imprisonment," as it is used primarily in § 5C1.1, would be: *confinement, in whatever setting (including community confinement, intermittent confinement and home confinement) in contrast to straight probation or a simple fine.*

In fairness to the Government, the term "imprisonment" does appear to be used in § 5C1.1 in another, narrower sense. Thus, again, in addressing the Zone B offender, § 5C1.1(c)(2) states that the minimum term may be satisfied by "a sentence of imprisonment that includes a term of supervised released with a condition that substitutes community confinement, ... provided that at least one month is satisfied by imprisonment." The second use of the word "imprisonment" in the quoted passage obviously carries a different meaning from the first. As the Government suggests, this secondary meaning of "imprisonment" might arguably be: *confinement but not including community confinement, intermittent confinement or home confinement.*

The mish-mash caused by this double use of the term "imprisonment" in two entirely different, indeed sharply opposed, ways in the same sentence is brought home in Application Note 3(C) to § 5C1.1. The Note approves "imprisonment" that

---

7. The point that the Sentencing Guidelines shape the *court's* discretion, not the BOP's, is elaborated in detail in *Ferguson v. Attorney General*, Civil No. 03–122–D–M3, slip op. at 42, 248 F.Supp.2d 547 at 569 (M.D.La. Feb.24, 2003).

8. References to the Sentencing Guidelines are drawn from the *Guidelines Manual* incorporating amendments effective November 1, 2002.

includes community confinement for Zone B offenders, so long as at least one month of this term of imprisonment is satisfied by "*actual* imprisonment." (Emphasis supplied). It is difficult to discern what might be intended by the phrase "actual imprisonment," but one can guess that the modifier "actual" reflects an attempt to resolve the confusion arising from the two uses of the term "imprisonment" in the guideline. Apparently, there is "imprisonment," and then there is "actual imprisonment," which is somehow different.

Unfortunately, this confusion is worse confounded in Application Note 4(B). This note addresses almost the same circumstances as Note 3(C), in nearly identical language, but inexplicably drops the word "actual." Note 4(B) simply states, in essence, that a term of *imprisonment* for a Zone C offender can "include" a term of supervised release with a condition of community confinement, provided that at least half this term of *imprisonment* "must be satisfied by *imprisonment*" (emphasis supplied), but *not* "actual" imprisonment as in Note 3(C).

To summarize, § 5C1.1 uses the term "imprisonment" in two precisely opposite ways. First, "imprisonment" can refer to a sentence of confinement, of some sort, in contrast to a sentence of straight probation or a simple fine. This confinement may occur in a number of settings, but the "imprisonment" certainly *includes* community confinement. This primary definition is consistent with 18 U.S.C. § 3551. Second, "imprisonment" a/k/a "actual imprisonment" can refer to a form or forms of confinement—exactly what is not clear—that does or do *not* include community confinement.

Section 5C1.1's slippery language, if it were the *only* guidance available, might perhaps justify alternative understandings of the scope of a *judge's* discretion in imposing a sentence under that specific guideline. To say, however, that § 5C1.1 somehow limits the scope of discretion afforded the BOP by Congress and renders the BOP's decades of placement decisions "unlawful" is nonsense.

More importantly, as noted at the outset of this section, § 5C1.1 is *not* the only guidance. In contrast to § 5C1.1's ambiguities, the statute, 18 U.S.C. § 3621—the dominant enactment—could hardly be clearer. Proper respect for the Congressional will, the decisions of the Supreme Court, the implicit approval of the Sentencing Commission, and the long practice of the BOP and the DOJ itself can lead the analysis to only one result: the BOP *had and has* "clear authority" to place in community confinement an offender sentenced to a term of imprisonment. Its practice was not in any sense "unlawful." No trial-level or appellate court decision has ever held to the contrary.

In closing this portion of the memorandum, it is important to underline again that the BOP has not merely announced that, within its general grant of authority, it has chosen to exercise its discretion by closing off community confinement to a particular offender or class of offenders. Rather, the BOP has announced that, based on its interpretation of the law, it views itself as *legally barred* from placing inmates in community corrections for the imprisonment portions of their sentences. The law, the BOP says, offers it no room for *any* exercise of discretion in this area. Since this interpretation of the law is patently incorrect, the court has the power, and the responsibility, to intervene.

C. *Judicial Review of the BOP's Action Is Proper.*

██ It is well established that a general presumption favors judicial review of administrative action, absent persuasive evidence that Congress intended to foreclose

such review. *United States v. Fausto,* 484 U.S. 439, 452, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Moreover, in making its review of agency action, the courts follow a two-step process. The first step is to consider whether "Congress has directly spoken to the issue." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As the Supreme Court has noted:

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*Id.* at 842–43, 104 S.Ct. 2778.

█ Indeed, even where no direct conflict exists between an agency's action and Congressional intent, courts have the responsibility to intervene and bar an agency from imposing a new rule retroactively. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (agency is without "the power to promulgate retroactive rules" absent express Congressional authorization); *see also Cort v. Crabtree,* 113 F.3d 1081, 1086 (9th Cir.1997) (barring disruption of "settled expectations" by BOP's retroactive rule).

█ Despite this authority, the Government argues that, whatever the propriety of its action, 18 U.S.C. § 3625 absolutely bars judicial review of discretionary decisions made by the BOP in this area. Supplemental Memorandum, at 9. (Docket No. 89). This argument is incorrect and ignores well established case law.

Title 18 U.S.C. § 3625 states that Sections 554–55, and 701–06 of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.,* "do not apply to the making of any determination, decision, or order under this subchapter." *Id.* It is true that the "subchapter" referred to encompasses the provisions of federal law governing the imprisonment of offenders by the BOP, including 18 U.S.C. § 3621. The specific provisions of the APA excluded, however, apply to *individual* adjudications and their judicial review. The obvious inference to be drawn from § 3625 is that provisions of the APA *not* excluded *do* apply to the BOP, particularly when the application would not adhere to any "determination, decision or order."

Significantly, the exclusions of APA applicability to the BOP set forth in § 3625 do not embrace 5 U.S.C. § 553, which governs rule-making. Indeed, in enacting § 3625, the House Report explicitly stated that the law "provides that rule-making activities are reviewable under the APA, while 'adjudication[s]' of specific cases' are not." *See Lyle v. Sivley,* 805 F.Supp. 755, 759 (D.Ariz.1992) (citing legislative history). As a result, numerous courts have found that the APA applies to BOP rule-making. *See, e.g., Fristoe v. Thompson,* 144 F.3d 627, 630–31 (10th Cir.1998) (Section 3625 prohibits court from reviewing an individual decision, but not from "interpreting the statute to determine whether the BOP exceeded its statutory authority"); *Martin v. Gerlinski,* 133 F.3d 1076, 1079 (8th Cir.1998) (Section 3625 "precludes judicial review of agency adjudicative decisions but not of rulemaking decisions"); *Rodriguez v. Herrera,* 72 F.Supp.2d 1229, 1231 n. 2 (D.Colo.1999) (court can review whether "formal regulation or informal policy statements" exceed BOP's administrative authority); *Cozine v. Crabtree,* 15 F.Supp.2d 997, 1014 (D.Or. 1998) (court can review whether BOP "erroneously interpreted the relevant statute"); *LaSorsa v. Spears,* 2 F.Supp.2d 550, 556 (S.D.N.Y.1998) (same); *Wiggins v. Wise,* 951 F.Supp. 614, 619 (S.D.W.V.1996) (BOP program statement is reviewable under the APA where "[i]t does not involve

the application of a regulation to a particular set of facts, but, rather, seeks to establish guidelines applicable to wide range of situations").

Recent circuit court decisions addressing a conflict between another BOP rule and 18 U.S.C. § 3621 (the same statute at issue in this case) overwhelmingly concluded that § 3625 did *not* bar judicial review of the BOP's erroneous interpretation of its statutory authority. The background of this closely analogous body of law may be sketched succinctly.

In 1994 Congress amended 18 U.S.C. § 3621 to provide incentives for prisoner participation in BOP drug treatment programs. The primary incentive took the form of a potential one-year sentence reduction for persons who successfully completed the program. Only prisoners convicted of "nonviolent offenses" were eligible. *See* 18 U.S.C. § 3621(e)(2)(B). In response to this statute, the BOP published a rule to implement the incentive, excluding from the definition of "nonviolent" offenders any prisoner convicted of a drug trafficking crime whose offense level under the Sentencing Guidelines had been enhanced by two points for possession of a dangerous weapon. In other words, as in this case, the BOP construed the federal statute to bar it, in any circumstance, from even considering an inmate for the incentive program who had received the two-point enhancement. From one end of the country to the other, prisoners who had received the two-point enhancement, but who wished to qualify for the program's potential one-year sentence reduction, attacked the BOP's rule as inconsistent with the controlling statute as passed by Congress. Drug trafficking, they argued, had been consistently found to be a "nonviolent of-

fense;" the sentencing enhancement, which involved no additional conviction, could not render them ineligible for the program.

The litigation around the BOP rule was extensive, and not a single court concluded that § 3625 barred judicial review. Ultimately, five circuits granted relief, finding that the BOP's interpretation of the governing statute was erroneous and that its rule defining a "nonviolent" offense was therefore invalid. *Fristoe v. Thompson,* 144 F.3d 627, 631 (10th Cir.1998) (BOP program statement not well reasoned and unpersuasive); *Byrd v. Hasty,* 142 F.3d 1395, 1398 (11th Cir.1998) (BOP interpretation "simply in conflict with statute's plain meaning"); *Martin v. Gerlinski,* 133 F.3d 1076, 1079 (8th Cir.1998) (BOP exceeded its authority and no deference was due); *Roussos v. Menifee,* 122 F.3d 159, 164 (3d Cir.1997) (same); *Downey v. Crabtree,* 100 F.3d 662, 668 (9th Cir.1996) (same).[9] Two circuits declined to afford relief and upheld the BOP rule, but without any suggestion that judicial review was improper. *Pelissero v. Thompson,* 170 F.3d 442, 447 (4th Cir.1999); *Venegas v. Henman,* 126 F.3d 760, 763 (5th Cir.1997).

With the issuance of the December 2002 memorandum, the BOP has fallen (or been pushed) into the same mud puddle it fell into during the "nonviolent offense" brouhaha. It has defined the scope of its discretion, as a matter of law, in a manner that is dramatically inconsistent with the plain language of the controlling statute. This is emphatically *not* a situation where the BOP has merely announced how it will, as a matter of policy, exercise its discretion by denying a designation. On the contrary, in two of the cases before the court, it *has* already

---

9. As will be seen, the remedies afforded the petitioners in these five cases provide precedent for the remedy in this case: treatment of the offenders consistent with the BOP's normal procedures, but *without* application of the invalid rule.

exercised its discretion, but reversed course based on an incorrect assessment of the scope of its authority. The distinction is terribly important. The BOP may use its discretion in various ways; it may not, through an erroneous interpretation of its powers, attempt to divest itself of the discretion Congress has given it.

The central flaw in the BOP's position may be illuminated by an analogy to downward departures. At sentencing, if the judge recognizes that he has discretion to depart, but chooses not to depart, the sentence will be affirmed. But, if the judge erroneously concludes that he has *no discretion* to depart, and therefore does not depart, then the sentence will normally be vacated on appeal and remanded for resentencing, to give the judge the opportunity to exercise the discretion he erroneously thought he lacked. Precisely the same mistake was made here. The BOP has denied the existence of its discretion (*i.e.*, its power to place these petitioners in community confinement) based on an erroneous interpretation of the scope of that discretion (*i.e.*, such placements are "unlawful"). This cannot stand.

Moreover, as the cases addressing the "nonviolent offense" conundrum confirm, the BOP's informal interpretation of the lawful scope of its powers is entitled, at most, to no more than minimal deference. Courts of appeals construed the applicability of the APA's notice and comment requirements differently in examining the "nonviolent offense" rule. The Eighth Circuit, for example, found the rule to be "a legislative rather than an interpretive rule" and thus fully reviewable under the APA. *Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir.1998). The Third Circuit, by contrast, found the rule to be merely an internal guideline, not subject to the APA's

strict requirements, but therefore entitled to no more than "some deference," and to be rejected "where it is inconsistent with the clear language of the statute." *Roussos v. Menifee*, 122 F.3d 159, 163–64 (3d Cir.1997).[10]

Whether the December 2002 BOP edict is viewed as a substantive (also known as a "legislative") rule, or merely an "interpretive" rule does not affect the outcome of this analysis. All paths lead to the same destination. If the edict is a substantive rule, it is invalid for lack of compliance with the APA's notice and comment requirements, as will be seen below. Even if it were considered merely interpretive, however, it would be entitled to no more than minimal deference and would be considered "only to the extent that it is well-reasoned and has 'power to persuade.'" *Fristoe v. Thompson*, 144 F.3d 627, 631 (10th Cir.1998), citing *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Since the BOP's new rule, denying the existence of the discretion Congress gave it, is neither well reasoned nor persuasive, it is invalid. The remedy, as in the "nonviolent offense" cases, is an order requiring the BOP to disregard its invalid rule.

### D. *The Manner of Adopting the New Rule Violated the APA.*

Even if the BOP's new rule did not contravene the plain words of the controlling statute, it would be invalid for an independent, alternative reason: the manner of the rule's adoption failed to satisfy the requirements of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

It is undisputed that the BOP failed to follow the procedures outlined in 5 U.S.C.

**10.** As will be seen, this court will conclude that the Eighth Circuit has the stronger argument.

§ 553 before promulgating its new rule regarding the designation of offenders to community confinement facilities. No general notice was given of the proposed rule change, and no opportunity was afforded for written comment. *See* § 553(b) and (d). It is well established that failure to comply with the APA's notice requirement renders a rule subject to the APA invalid. *See, e.g., Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs,* 260 F.3d 1365, 1375 (Fed.Cir.2001).

The closer question is whether the BOP's December 2002 edict constituted the kind of rule that is subject to the APA. The statute defines the term "rule" very broadly to encompass "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). This definition does not require that the agency's pronouncement be formally designated as a rule or regulation to fall within the APA framework. The Fourth Circuit addressed this issue in the context of the Clean Water Act.

> While the methodology involved in this proceeding was not designated specifically as a "rule" or "regulation," we find that it falls within the definition of a rule as set forth in the Administrative Procedure Act to the extent that it is an agency statement with a prospective effect designed to implement section 304(b)(4)(B) of the Clean Water Act.

*Am. Paper Inst. v. U.S. Envtl. Prot. Agency,* 660 F.2d 954, 959 n. 13 (4th Cir.1981).

Given the broad definition of a "rule," therefore, the Government cannot contend that the BOP's radically contracted definition of the lawful scope of its power, as set forth in the December 20, 2002 memo (Ex. B), is not a rule, simply because it was not explicitly labeled as such. Instead, the Government must argue that the BOP's new rule is exempt from APA scrutiny,

because it falls in the category of "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(3)(A). Although this argument is not without force (largely because the distinction between a "substantive" and an "interpretive" rule is so ill defined) it is ultimately unpersuasive.

To begin with, the case law that describes, in general terms, the uncertain boundary between "substantive" rules (which do fall under the APA) and "interpretive" rules (which do not) tends to support the petitioners here. The Supreme Court has made it clear that APA rulemaking provisions do apply when an agency adopts a "new position inconsistent with any of the [agency's] existing regulations." *Shalala v. Guernsey Mem'l. Hosp.,* 514 U.S. 87, 100, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). Put differently, as Judge Bownes stated in *La Casa Del Convaleciente v. Sullivan,* 965 F.2d 1175 (1st Cir. 1992), "[i]f a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive." *Id.* at 1178, citing *Ohio Dep't. of Human Servs. v. U.S. Dept. of HHS,* 862 F.2d 1228, 1233 (6th Cir.1988); *see also Warder v. Shalala,* 149 F.3d 73, 80–81 (1st Cir. 1998) (adopting *Guernsey* and *Convaleciente* standards). In this case, the BOP has not only adopted a "new position" inconsistent with its previous policy statements, but has drastically truncated its own discretion in a manner that is in no way "outlined" in the applicable statute. Employing these general guideposts in this admittedly fog-bound analytical landscape the court must conclude that the December 2002 pronouncement was a "substantive" and not an "interpretive" rule. It was therefore subject to the requirements of the APA.

In reaching this conclusion, the court is aware that Supreme Court *dicta* in *Koray* assumed that the rule at issue in that case, which disallowed time spent while released to a community confinement facility as a credit against the ultimate term of imprisonment, was merely an "interpretive" rule not requiring notice and comment. *Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995). However, the rule in this case has far broader impact and directly shapes the exercise of the BOP's core responsibility, the designation of offenders to appropriate facilities. Moreover, unlike the rule in *Koray,* the rule here does represent a drastic departure from the BOP's previous regulations and policies, a factor which the Court found crucial in its *Guernsey Memorial Hospital* decision.

Furthermore, as noted above, the logic of *Martin v. Gerlinski,* 133 F.3d 1076 (8th Cir.1998), strongly supports the court's conclusion here. In that case, the Court of Appeals was examining the validity of the BOP's rule defining "nonviolent offense." Judge McMillian concluded that the rule was legislative rather than interpretive. The reason for this was that the BOP's Program Statement did not merely "explain" the meaning of the pertinent phrase, but "expanded" the reach of the regulation to bar persons not otherwise banned by Congress' statute from the early release program. *Id.* at 1079.

In this case as well, the effect of the new rule is not merely explanatory. Far more starkly than the rule in *Gerlinski,* the rule at issue here serves to bar any and all offenders from a designation option, community confinement, that heretofore had potentially been available under the statute. A rule with such powerful substan-

tive effect must comply with the strictures of the APA.[11]

As will be seen now, even if the rule were *not* directly contrary to the plain words of the controlling statute, and even it had been adopted pursuant to the APA as required, it would still be inapplicable to the petitioners here, all of whom were sentenced prior to the rule's adoption—not only in ignorance of the BOP's imminent reinterpretation of the scope of its own power, but actively misled as to the breadth of that power.

### E. *The New Rule May Not Be Applied Retroactively.*

■ The new rule, even if valid, could not be applied to any of these petitioners, for two reasons. First, application of the new rule would invade the protections afforded criminal defendants from punishment imposed in violation of the *ex post facto* clause of the Constitution. U.S. Const., Art. I § 10, cl. 1. Second, retroactive application would mean that the sentences in this case were based on an "objectively ascertainable error" and therefore invalid. *United States. v. Addonizio,* 442 U.S. 178, 187, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979).

It is not necessary to extend this already lengthy memorandum with a protracted discussion of the application of the *ex post facto* clause to the issues raised by these petitions. The job has already been done very well by two recent district court opinions from the District of Columbia. *See Ashkenazi v. Attorney Gen.,* 246 F.Supp.2d 1 (D.D.C.2003); *Culter v. United States,* 241 F.Supp.2d 19 (D.D.C.2003). *Culter* stated in *dicta,* at 24 n. 6, and *Ashkenazi* held, at 3 *et seq,* that retroactive applica-

---

**11.** Significantly, the only district court to address the question of the new rule's status directly has concluded that it "is not merely interpretive" but is "equivalent to new legislation." *Ashkenazi v. Attorney Gen.,* 246 F.Supp.2d 1, 4 n. 9 (D.D.C.2003).

tion of the new rule would contravene the *ex post facto* clause.

The controlling decision is *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), in which the Supreme Court unanimously held that retroactive cancellation of "early release credits" awarded to alleviate prison overcrowding violated the *ex post facto* clause. In *Lynce* the Court brushed aside the argument that the constitutional provision could not have been violated because the cancellation did not affect the actual sentence, and because the benefit of the credit was not, in any case, guaranteed. Citing *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), Justice Stevens explained that "the removal of such provisions can constitute an increase in punishment, because a 'prisoner's *eligibility* for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed.'" *Lynce* at 445–46, 117 S.Ct. 891 (emphasis supplied), citing *Weaver,* 450 U.S. at 32, 101 S.Ct. 960. The Court found the respondent's argument that the benefit was not guaranteed "singularly unpersuasive" since (as with two of the petitioners here) Lynce had in fact already received the benefit and had it taken away from him. Under these circumstances the petitioner was "unquestionably disadvantaged" and therefore entitled to the protection of the *ex post facto* clause. *Id.* at 446–47, 101 S.Ct. 960.

Since the petitioners have suffered an increase in their punishment by having their *eligibility* for community confinement withdrawn, long after they committed their crimes, long after they made the decision to plead, and long after this judge in reliance on their eligibility sentenced them, and (in two cases) months after they began serving their sentences, the *ex post facto* clause requires this court to order

the BOP to make their designations without regard to the new, invalid rule.

The Government's argument notwithstanding, neither *Garner v. Jones,* 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000), nor *Cal. Dept. of Corr. v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), is to the contrary. In *Garner* the Court recognized that, in some cases, a "retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement" would be prohibited, provided that it created "'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Garner,* 529 U.S. at 250, 120 S.Ct. 1362, citing *Morales,* 514 U.S. at 508–09, 115 S.Ct. 1597. Contrary to the Government's argument, the "measure of punishment" is not defined solely in terms of length of incarceration. As the Court recognized, the measure of punishment for purposes of the *ex post facto* clause could "in some instances" include, for example, the timing of eligibility for parole review. *Id.* Ultimately, in both *Garner* and *Morales,* the Court concluded that no *ex post facto* violation had been demonstrated, because the actual practices of the state authorities had not been shown to create a risk of an increase in the measure of punishment. The state authorities, in those cases, still retained discretion to afford relief to the prisoner; therefore, the prohibited increase in the risk of enhanced punishment was entirely speculative.

Here, the situation is entirely different; the risk is not at all speculative. For these three petitioners, the progression from a sentence *with* eligibility for possible community confinement to one *without* the remotest possibility of such eligibility constitutes a significant increase in the measure of punishment for the offenses they pled guilty to. It is hard to imagine any fairminded argument to the contrary, except from someone blind to the realities of

imprisonment. Indeed, having sentenced many offenders, I can say that potential eligibility for community confinement, even without a guarantee, is a very substantial consideration at sentencing both to the defendant and to the judge. Moreover, for these petitioners the problem cannot be cured, as in *Garner* and *Morales*, by exercise of any discretion on the part of agency officials. The measure of punishment was one thing at the time of sentencing; it is substantially greater now, and with no possibility of correction. Thus, the petitioners occupy the classic position of persons entitled to the protection of the *ex post facto* clause; the new rule may not be applied to them.

In addition, as noted above, even if the BOP's proposed new rule did not violate the *ex post facto* clause, considerations of due process would render application of the rule improper in these circumstances. Numerous decisions confirm that a sentence based upon an erroneous factual assumption or other error violates due process. *United States v. Inglesi,* 988 F.2d 500, 502 (4th Cir.1993) (due process would be violated in sentencing "by the use of inaccurate information"); *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir.1988) (sentence "must be set aside" when "false information" formed part of its basis); *Parks v. United States,* 832 F.2d 1244, 1246 (11th Cir.1987) (due process "protects a defendant's right not to be sentenced on the basis of false information and invalid premises"); *United States v. Katzin,* 824 F.2d 234, 241 (3d Cir.1987) ("[S]entencing based on a mistaken factual assumption violates due process.").

In *United States v. Addonizio,* 442 U.S. 178, 187, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), the Supreme Court held that a sentence based on an "objectively ascertainable error" would be invalid. The Government attempts to limit the species of mistake invalidating a sentence to "misin-

formation of constitutional magnitude" involving use of clearly tainted information, as in *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). Thus, the Government concedes, when a judge imposes a sentence based in part upon a prior conviction secured without benefit of counsel, the sentence may not stand.

But *Addonizio* does not suggest that *Tucker* necessarily defines the outer limit of the kind of misinformation that will undermine the integrity of a sentence so significantly as to render it invalid. In *King v. Hoke* 825 F.2d 720 (2d Cir.1987), a post-*Addonizio* decision, the Court of Appeals found that the sentencing judge's incorrect understanding of the defendant's minimum statutory parole eligibility date deprived the defendant of due process at sentencing. In that case, Judge Newman found that the state court judge had "explicitly relied" on a repealed statute in selecting King's sentence. *Id.* at 724. The sentencing judge's "objectively ascertainable error" distinguished the case from *Addonizio* and made *habeas* relief proper. *Id.* at 725. *King* was applied in *United States v. Hollenbeck,* 932 F.Supp. 53 (N.D.N.Y.1996), where the court granted the defendant's motion to reduce his sentence based on misinformation given to the court by the BOP at the time of sentencing. *Id.* at 58.

Here, I made an "objectively ascertainable error" in imposing these sentences, as a result of what the BOP now tells me was a mistaken factual assumption. This assumption was that all three of these petitioners would be eligible for possible designation to a community confinement facility. The offenders were all placed in a much worse position than they would have been in had the sentencing proceeding not been shrouded in the fog of this supposed error. Certainly, had defendants and their attorneys known that, in fact, *no* possibility

existed that these petitioners would be designated to community confinement, their arguments at the sentencings would have been quite different. The distortion of the sentencing proceeding caused by the error was fundamental. Without the mistaken assumption I had been led into, the substantive arguments before me would have been different, and there is every likelihood the sentences would have been different. Few fact patterns could offer a clearer example of a violation of due process.

## IV. *REMEDY*

■ The Government contends that, whatever the problems created by the BOP's abrupt action, petitioners possess no remedy, because the impact of the BOP's rule change is simply to frustrate this court's "subjective expectations" regarding the manner or place of the petitioners' incarceration. Memorandum (Dkt.84), at 11. *United States v. Addonizio*, 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), the Government says, holds that such "frustration" cannot form the basis for relief under 18 U.S.C. § 2255.[12]

*Addonizio*, as the Government presents it, is a kind of *ignis fatuus*, inclined to lead by a false trail into an analytical bog. *Addonizio* dates from the days of the Parole Commission, prior to the era of "truth in sentencing." In *Addonizio*, the trial judge had imposed a sentence of ten years imprisonment upon the corrupt former mayor of Newark, New Jersey. The judge had said nothing about his intentions at the time of sentencing. However, Parole Commission policy at the time the sentence was imposed had tended to favor consideration for parole eligibility upon completion of one-third of the sentence. After the defendant began serving his sen-

tence, the Parole Commission changed its policy to give greater weight to the seriousness of the offense; as a result, Addonizio was rejected twice for parole. The former mayor then filed a petition pursuant to § 2255, which the judge granted. The basis for relief was that at the time of sentencing (the judge now said), working from "the generally-held notions ... of the operation of the parole system in 1970," the court had anticipated that Addonizio would receive a "meaningful parole hearing" approximately three and a half to four years into his sentence. *Id.* at 181 n. 3, 183, 99 S.Ct. 2235. Not surprisingly, the Court held that frustration of this kind of subjective expectation regarding the BOP's exercise of its discretion was insufficient to provide a basis for § 2255 relief. Relief under § 2255 in these circumstances would obviously have unloosed a flood of intractable difficulties. As Justice Stevens noted, "years later, it will often be difficult to reconstruct with any certainty the subjective intent of the judge at the time of sentencing." *Id.* at 188, 99 S.Ct. 2235. Attempts to do so, he said, "may well increase the inconsistent treatment of defendants." *Id.*

These cases differ from *Addonizio* in at least four significant ways. First, no argument was offered in *Addonizio* that the Parole Commission was conducting itself in a manner inconsistent with the intentions of Congress expressed in the controlling statutes. The Commission in *Addonizio* was exercising its discretion, not attempting to disclaim it. Thus, no *Chevron*-type review of agency action was involved. Second, no substantive rule change was being effectuated by the Parole Commission; no argument suggesting any violation of the APA's notice and comment requirements was offered or dis-

---

12. As noted, to the extent that amendment to the petition to add a claim pursuant to 18 U.S.C. § 2241 would provide petitioner's a broader base to obtain relief, then this court construes the petition to contain such a claim. See n.1 *supra*.

cussed. Third, the Court expressly declined to address the validity of the Parole Commission's actions, including the retroactive application of its new policy. *Id.* at 184, 99 S.Ct. 2235. The Court therefore entered into no discussion of the application of the Constitution's *ex post facto* clause to the issues in the case. Fourth, and finally, whereas the trial judge in *Addonizio* relied on "generally held notions" about how the agency might be likely exercise its discretion, in these cases the court relied on a statutorily mandated and explicitly communicated definition of the scope of the BOP's discretion, confirmed by decades of practice. Moreover, the court made that reliance clear on the record in rendering its recommendations. In sum, the analytical issues in these cases are entirely different, and none of the practical problems noted by the Court in *Addonizio* threaten undue complications. Section 2255 relief is therefore available.

As noted *supra* at n. 9, the line of cases addressing the "nonviolent offense" issue, discussed above, provide the court with a template for the remedy here. When the BOP adopts a rule inconsistent with the controlling statute, the proper remedy is to order the agency to treat the petitioner without regard to the invalid rule. A Second Circuit case, not involving the "nonviolent offense" issue offers another good example of this accepted remedial approach.

In *McCarthy v. Doe,* 146 F.3d 118 (2d Cir.1998), the BOP refused to recognize its own authority to designate the petitioner to a state correctional facility to serve his federal sentence. In response to the § 2255 petition, Chief Judge Murtha concluded that the BOP had interpreted the controlling statute incorrectly, and in fact did possess the discretion to consider such a designation. *Id.* at 121. The BOP was therefore ordered to disregard its incorrect and overly-limited interpretation of the scope of its discretion and give the designation to a state facility "full and fair" consideration. *Id.* at 123. In other words, the BOP was ordered to discard its false interpretation of the law in dealing with the petitioner.

For Iacaboni and McKenzie, the two defendants now successfully serving their sentences, this "full and fair" consideration has already taken place, and the remedy is therefore simple. The BOP will be permanently enjoined from transferring either of these petitioners out of community confinement based upon the new, invalid rule. Iacaboni and McKenzie will serve out the few remaining months of their imprisonment in their current community confinement settings.

For petitioner Pandolfi the remedy is different, though equally simple. The BOP will be ordered to designate a place of imprisonment for the petitioner without taking into consideration, in any way, the new and invalid rule limiting the scope of its discretion in designating offenders to community confinement. In other words, the designation will be made based entirely upon pre-December 2002 criteria. Given its respect for this agency's professionalism, the court expects the BOP to comply with this order in good faith, without manipulation, or to seek an appeal of this order.[13] The surrender date of the petitioner Pandolfi will be extended to May 23, 2003. This will give the Gov-

---

**13.** In one recent case, the BOP, faced with the possibility of a similar order, purported to "reconsider" the petitioner's designation based on the old criteria and redesignate him to a prison facility. *Ashkenazi v. Attorney Gen.,* 246 F.Supp.2d 1, 7–8 (D.D.C.2003). Judge Kessler viewed the BOP's position as "passing strange" in view of the absence of any paperwork documenting the reconsideration, and proceeded to afford relief regardless. As *Ashkenazi* demonstrates, the court has the power to remedy any abuse of discretion of this sort.

ernment sufficient time to determine if it will appeal. In the event of an appeal, the court will further stay the sentence pending appeal to avoid any risk that the defendant, having served his term of imprisonment in community confinement, will be ordered back to re-serve his sentence in a "prison institution." [14]

With regard to future proceedings, based on this memorandum, the Government is hereby placed on notice that I view the law as permitting me to sentence defendants to short terms of imprisonment with a recommendation that the sentence be served in community confinement. When I do this, I intend to order the BOP to make its assessment of my recommendation, and its ultimate designation, without regard for the new and invalid rule announced in December 2002.

## V. CONCLUSION

It is very important that the complex legal and policy issues addressed in this memorandum not be re-framed as a debate over whether criminals should be punished. They should be. The real issue is whether the executive branch may adopt a rigid new rule about this punishment decision that, both substantively and in the manner of its adoption, conflicts with the clearly expressed will of Congress. The secondary issue is whether, even if the new rule were valid, its retroactive application would violate the constitutional and due process protections that all citizens enjoy and that the courts are sworn to uphold. On both these issues, the law heavily favors the petitioners.

For the foregoing reasons, the petitions for relief pursuant to § 2255 in these three cases are hereby ALLOWED. Separate orders will issue in each case.

## ORDER

For the reasons set forth in the memorandum of this day, the petitioner's Motion to Vacate (Docket No. 1) is hereby ALLOWED. The respondent is hereby enjoined from transferring the petitioner from his current community confinement placement based upon the Bureau of Prisons' change of policy regarding community confinement announced in December 2002. Petitioner's ongoing placement in community confinement will require him to continue to comply fully with all BOP conditions and requirements applicable prior to December 2002. Except in the event of a bonafide emergency, however, no change will be made in the petitioner's placement for any reason without seven days' prior notification to this court.

It is So Ordered.

---

14. Two other possible remedies have been considered by the court and rejected as unnecessary and overly cumbersome. First, the court could bring the defendants back for re-sentencing. Second, the court could allow the defendants an opportunity to withdraw their guilty pleas. Although, in view of the invalidity of the rule, both remedies are potentially available, neither defense counsel nor the Government has suggested them. In the circumstances, the remedial approach adopted by the court is the simplest and most appropriate.